IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F . I L E
AUG 2 7 ·
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

VINCENT T. TAYLOR  )
  Plaintiff,   )
        )
   v.    )  Case No. 1:10cv181
        )
THE CNA CORPORATION, et al., )
  Defendants.   )
        )

## MEMORANDUM OPINION

In this employment dispute, plaintiff claims his employer discriminatorily disciplined and

constructively discharged him in violation of 42 U.S.C. § 1981. He also charges defendants with

state law claims of defamation, breach of contract, tortious interference with business

expectancy, civil conspiracy, and intentional infliction of emotional distress. For the reasons that

follow, all of plaintiff's claims fail on summary judgment insofar as the undisputed record facts

demonstrate that defendants are entitled to judgment as a matter of law.

**I.[1]**

Plaintiff Vincent Taylor, an African-American male, graduated from the University of

Maryland in 1981 and subsequently obtained masters degrees in criminal justice, public

---

[1] The facts recited herein are derived from the pleadings and the record taken as a whole, and are not materially disputed except where specifically identified as such. Where material disputes of fact are identified, the analysis proceeds by assuming plaintiff's claim of fact. *See Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 332 (4th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). Where defendants identified facts in the record to support their motion for summary judgment, and Taylor failed to cite evidence in the record to dispute those facts, the facts defendants identified are taken as true. *See* Rule 56(e)(2), Fed. R. Civ. P. ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial."); Local Civil Rule 56(B) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

administration, and strategic studies from various academic institutions, including the U.S. Army War College. Taylor also served for many years on active duty in the U.S. Army and then in the U.S. Army Reserves. Concurrent in part with his time on active duty, Taylor worked in management and policy roles at the Department of Defense, the Department of State, and the Department of Transportation. On September 6, 2005, Admiral Lee Gunn, a Caucasian male and President of The CNA Corporation's Institute of Public Research, hired Taylor as a Senior Fellow based on Taylor's experience and qualifications in the public sector. Less than a year later, Gunn promoted Taylor to Vice President in charge of the Center for Human Capital Development.

Defendant The CNA Corporation ("CNA") provides a variety of consulting and analytics services for the military and other government sectors. Individual defendants Susan Langlitz, Ann Casey, and Elizabeth Hayes are Caucasian females employed by CNA. Langlitz and Casey were Taylor's subordinates, while Hayes worked in CNA's Human Resources department.

As president of Taylor's division, Gunn supervised Taylor and was the principal decision-maker with respect to the challenged employment decisions. As noted, Gunn recruited Taylor, and Taylor's relationship with Gunn remained positive throughout Taylor's tenure at CNA. Indeed, Taylor has not disputed that Gunn treated him fairly, respectfully, and most importantly, without racial animus.

As a vice president, Taylor was eligible for discretionary annual bonuses of up to 20% of his salary. In February 2008, Gunn recommended Taylor for the maximum bonus possible, $39,035, based on Taylor's work in 2007. The following year, Taylor's bonus was approximately $15,000, based, in Gunn's words, on "less than stellar earnings of Taylor's division and other performance factors." Gunn Aff. ¶ 18. Taylor resigned his position with the

company in 2010 before bonuses were calculated or awarded, but Gunn has asserted that

Taylor's bonus would have been close to zero based on the poor overall performance of Taylor's

division and the "challenging aspects of [Taylor's] professional behavior." *Id.*

Between 2007 and Taylor's departure in 2010, CNA received the following complaints

from its employees concerning Taylor's behavior[2]:

i. In June 2007, Purvi Dudhat, who worked in Taylor's department, complained to Human Resources ("HR") about Taylor's "abrasive and disrespectful" behavior toward her that "left her in tears." She further characterized Taylor as "abusive" and claimed she did not want to be left alone with him. Taylor does not respond to these allegations in his brief except to note that his reviews in 2007 and 2008 were positive overall and lacked any reference to Dudhat's complaint, suggesting, in his view, that the complaint was not taken seriously by CNA.

ii. In July 2008, defendant Ann Casey complained to HR about Taylor's behavior citing general mistreatment. In the summer of 2009, Casey made a verbal complaint directly to Gunn, calling Taylor's behavior "intimidating, bullying, and totally inappropriate." Taylor denies that his tone was bullying or otherwise inappropriate, but he admits telling Casey that her tone was "bitter" and that her actions "[d]idn't help with the teamwork."

iii. Seetal Patel, a research specialist, alleged that during June 2009, an incident occurred where Taylor made a joke in front of Patel and her coworkers implying that Patel was a prostitute. Patel described the incident in a memorandum she wrote to "file" one week after it occurred, calling Taylor's comment "not only unprofessional but . . . sexist," adding that it made her "feel degraded and humiliated." Patel did not discuss the incident with others at CNA until Patel's exit interview with defendant Hayes on October 6, 2009. In his brief opposing summary judgment, Taylor does not dispute making the statements. Instead, Taylor notes that after he called Patel to discuss her complaint, Patel sent an email to Hayes on December 22, 2009, expressing "concern[] that there has been a breach to the anonymous nature of the information I did provide in my exit interview." The email further stated that Patel "do[es] not recall telling HR that . . . [Taylor] had said things that had a 'sexual overtone.'"

---

[2] The parties dispute when Taylor first received notice of such complaints, but at the very least, he was made aware of several complaints in October 2009. In any event, this dispute is immaterial to the summary judgment analysis.

iv. In 2008 or 2009,[3] Cindy Troutman complained to a superior that Taylor had been difficult to work with, following which Taylor was replaced on that particular project. Taylor asserts that he only had one meeting with Troutman, which he describes as "amenable." Taylor acknowledges that Troutman had "a problem" with him, and he claims he was going to make an appointment with Troutman to "figure this out," but never scheduled such a meeting because "it wasn't [his] highest priority."

v. Defendant Susan Langlitz complained to HR on or about October 4, 2009, of intimidating behavior and sexual harassment by Taylor. As to the sexual harassment allegation, Langlitz stated that Taylor repeatedly told her she was attractive and asked her such questions as why she was not married, whether she dated African-American men, and whether she would go out with him. Taylor admits asking Langlitz if she had dated an African-American man, calling her attractive almost every morning, and asking whether she was married, but he denies the other statements, and he denies that any of his statements were harassing. Langlitz also complained that Taylor accused her of racism when she attempted to go "over his head" to Gunn to discuss a potential business trip to Prague. As to this allegation, Taylor denies accusing Langlitz of racism, but he admits that the conversation in question became "sharp" and that he "got up and left because it wasn't going anywhere."

vi. During her investigation of Taylor in October 2009, Claudette Simpson of CNA's HR department interviewed Robert Hausmann, one of Taylor's subordinates. Hausmann told Simpson that he had witnessed Taylor being "very aggressive" with other subordinates by raising his voice, throwing papers, and other similar acts. Hausmann added that he was concerned about Taylor's treatment of women in his department, since he had seen women emerge from Taylor's office in tears on more than one occasion. Most significantly from Simpson's perspective, Hausmann stated that he was concerned for his own safety in reporting this information because he feared physical retaliation from Taylor. In response, Taylor points to statements in Hausmann's deposition indicating that Taylor was "fair" to Hausmann in terms of Hausmann's "career development." Taylor also cites an email from Hausmann to Taylor in February 2010, after Taylor had left CNA, where Hausmann said, "Miss seeing you around here. . . . Let me know if you have time to chat or grab lunch/coffee some time."

Broadly speaking, Taylor does not deny the existence of the complaints against him, but he

asserts that his behavior never rose to the level of abuse, intimidation, or sexual harassment.

---

[3] Although the date of the meeting is not clear from the record, it is not material to the summary judgment analysis.

On October 7, 2009, Simpson, who is African-American, met with Gunn to discuss the most recent complaints against Taylor. Based on the seriousness of the allegations, Simpson recommended that the complaints be investigated and that Taylor be placed on indefinite paid administrative leave while the investigation was pending, in part because the complainants expressed concern about reprisals from Taylor if he learned they were aiding in the investigation. Gunn was the sole decision-maker on whether to place Taylor on paid leave, and because he agreed with Simpson's recommendations, he placed Taylor on paid leave that same day, October 7. Gunn and Simpson met with Taylor for about fifteen minutes to explain the situation and to place him on leave. This first period of paid administrative leave lasted until October 16, 2009.

While Taylor was on leave, CNA made no official announcement concerning the reason for or length of Taylor's absence. Gunn claimed that because Taylor was not dealing directly with clients at that time, there was no need to express a position on what clients would be told if they inquired about Taylor. One employee, Nwadimma Omoike, stated in her deposition that "it looked like [Taylor] had done something inappropriate or wrong."

On October 14, 2009, Hayes and Simpson interviewed Taylor regarding the complaints. Taylor asserted that Casey and Langlitz should not be believed because, at the time the complaints were made, both women were aware that their continued employment was in jeopardy owing to performance issues. Yet, Taylor does not dispute that Simpson researched Taylor's claim in this regard by reviewing the two employees' performance records, including their performance reviews by Taylor. Casey's March 2009 performance evaluation, which Taylor reviewed and signed, showed that she had earned a score of 3.5 out of 5, which is precisely midway between "Performance meets and occasionally exceeds what is expected" and "Superior performance that frequently exceeds what is expected." Simpson also reviewed

Langlitz's March 2009 evaluation, which, at a score of 3.0, indicated that Langlitz's "Performance meets and occasionally exceeds what is expected." Simpson also found that neither employee had ever been placed on a performance improvement plan ("PIP") as would be typical for underperforming employees. Based on this investigation, Simpson concluded that Taylor's claim—that the complaints by Casey and Langlitz were not credible because they feared termination—was unfounded. Taylor nonetheless notes that he did have discussions with both Casey and Langlitz regarding their performance, and he discussed his qualms about their work with Robert Hausmann and Nwadimma Omoike. Omoike also recalls Taylor discussing with her whether Casey should be placed on a PIP, but the record reflects that no decision to do so was made. Importantly, Casey was not made aware that she was being considered for a PIP. Simpson did not interview Omoike regarding these events, although Taylor suggested that Simpson do so. Simpson did interview Hausmann, however, and as indicated previously, Hausmann expressed concern over Taylor's "aggressive" behavior and said he feared physical retaliation from Taylor if Taylor learned Hausmann brought these issues to HR.

Based primarily on Hausmann's safety concerns, Simpson contacted CNA's Employment Assistance Program ("EAP") for advice on how best to handle the situation. The EAP recommended that Taylor be referred to a mental health affiliate for a fitness-for-duty evaluation. Consistent with this recommendation, Simpson suggested to Gunn that Taylor again be placed on paid administrative leave with the requirement that he meet with a psychiatrist for an evaluation before returning to work. Simpson's recommendations were based not only on her investigation, but also her personal experience with Taylor, where she observed him being "pushy" and intimidating. Gunn agreed with these recommendations and placed Taylor on paid administrative leave on October 22. On November 9, Gunn provided Taylor a memorandum setting forth

6

conditions for Taylor's continued employment at CNA, including (i) working with an executive coach regarding anger management, sexual harassment, and team building; (ii) attending a sexual harassment refresher session; (iii) attending a respectful workplace refresher session; and (iv) attending four EAP sessions "to help [him] understand and stop these behaviors."

Taylor met with Dr. Brian Crowley, the psychiatrist recommended by the EAP, on October 26 and November 9, 2009. Dr. Crowley requested permission to review background information on Taylor prior to the evaluation, and he was provided such information by CNA, including the complaints lodged against Taylor up to that point. On November 12, Dr. Crowley provided his evaluation to CNA, stating the following:

> I concur completely in the strong directive which has been given to Mr. Taylor as a condition of his continued employment. He will need to overcome his denial and to learn how his own behaviors have adversely affected company morale and caused him and his coworkers problems.

Dr. Crowley added that "with those conditions spelled out" by Gunn in his November 9 memorandum, it would be "reasonable and safe" to allow Taylor to return to work.

In addition to relying on the recommendations of Simpson and Dr. Crowley, Gunn considered his own experience with Taylor. Not only had Gunn found Taylor to be "difficult" in meetings, but three other vice presidents had also complained to Gunn that they found it difficult to work with Taylor. Ultimately, Gunn decided to allow Taylor to return to work, provided Taylor complied with the four conditions set forth in the November 9 memorandum, namely that he (i) work with an executive coach; (ii) attend a sexual harassment refresher session; (iii) attend a respectful workplace refresher session; and (iv) attend four EAP sessions. On November 16, 2009, Gunn drafted a memorandum (the "November 16 Memorandum") to memorialize this decision and the four conditions. The memorandum cited Taylor's "intimidating and threatening behavior" toward subordinates, including:

- Using a harsh or demeaning tone;
- Leaning over a table and getting into the personal space of a subordinate[;]
- Using sophistry to control behavior and gain cooperation;
- Standing when others are sitting to reinforce your authoritarian position;
- Turning your back on people who are speaking to indicate the conversation is over;
- Challenging subordinates as to your effectiveness as a manager;
- Encouraging subordinates to talk about their personal lives or discussing your private affairs; [and]
- Displaying a pattern of wild mood swings/erratic temperament in your personal dealings with subordinates[.]

Taylor reviewed and objected to the memorandum. In his view, the first sentence of the memorandum, which cited "two" sexual harassment complaints against Taylor, was inaccurate. Gunn apparently agreed and modified the first sentence to reflect that one official complaint for sexual harassment had been made against Taylor.[4] On December 3, 2009, following Gunn's modification of the first sentence, Taylor signed the memorandum, thereby "acknowledg[ing] the seriousness of the above complaints and signif[ying] [his] commitment to follow through actions." Taylor also handwrote the following note at the end of the memorandum:

MY SIGNATURE ACKNOWLEDGES ALLEGATIONS WERE MADE AGAINST ME WHICH I DO NOT BELIEVE WERE SUBSTANTIATED. I HAVE SIGNED THIS LETTER UNDER DURESS AND THREAT OF BEING TERMINATED FROM CNA. AS A CONDITION OF EMPLOYMENT, I AGREE TO ABIDE BY AND FOLLOW THROUGH ON THE ACTIONS OUTLINED IN THIS MEMORANDUM.

After Taylor signed the letter, CNA engaged the services of Dr. Sheena Teel to meet with Taylor for executive coaching in accordance with the memorandum. Yet, Taylor left CNA's employment before ever meeting with Dr. Teel.

---

[4] Taylor makes much of this correction in his brief opposing summary judgment. It is true that only one formal complaint explicitly cited sexual harassment, but as Taylor recalled in his deposition, Hayes explained to him that others in the office had complained—albeit not through the *formal* complaint process—of Taylor's sexist comments. The formal complaint, taken together with the informal complaints, reasonably explains the original language.

On December 1, 2009, shortly before Taylor signed the November 16 Memorandum, Langlitz apparently reported that she thought she might have seen a gun in Taylor's briefcase. The matter was brought to the attention of Simpson and Gunn, who then asked Taylor's permission to inspect his briefcase to confirm that he did not have a weapon. Taylor was insulted by the incident, but complied, and no gun was found. Langlitz later admitted that she was not sure if she had seen the gun or if she had dreamt it. Taylor argues that this event cast doubt on Langlitz's credibility as a whole, such that Langlitz's other complaints against Taylor, which were still under review, should have been discredited by Simpson and Gunn. But Simpson and Gunn stated that they did not consider whether this event impacted Langlitz's credibility, as they were focused on making sure they exercised appropriate caution in handling such a serious allegation.

Two weeks later, on December 15, 2009, Taylor abruptly resigned from CNA. He claims he resigned because further meetings with a mental health professional, namely Dr. Teel, would jeopardize his security clearance, and since that clearance was a condition of employment at CNA, he believed the counseling sessions would effectively lead to his termination. Yet, Taylor cites no evidence supporting his belief that such sessions would result in the revocation of his security clearance. Indeed, contemporaneous with or shortly after his resignation from CNA, Taylor accepted a position with the Defense Security Service ("DSS"), a company in which he had apparently expressed interest as early as October 5, 2009. This position came with a decrease in salary and benefits as compared with Taylor's position at CNA.

Taylor cites a number of additional facts, many of which are undisputed, that he contends support his claim that CNA's actions were racially motivated. First, he notes that Casey has admitted to saying to a coworker, on September 10, 2009, that she believed Taylor "has a

problem with middle-aged white women." Second, Taylor has identified a private email from Langlitz to Casey referring to a "plan" for handling Taylor's return to CNA following his second period of administrative leave, but the context for the email makes it obvious, even when viewed in a light most favorable to Taylor, that the "plan," which was shared with Hausmann, Gunn, Hayes, and Simpson, referred to strategies for avoiding any awkwardness or hostility upon Taylor's return. Third, Taylor notes that Simpson told Dr. Teel, with whom Taylor would have met for counseling had he not resigned from CNA, that "race was important" to Taylor and that "white women are his scorn." Finally, Taylor points to other individuals at CNA as a comparison to demonstrate a pattern of racially-biased treatment. These comparators are discussed in greater detail *infra* Part III.A.1.

## II.

The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless that party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322.

## III.

Taylor's complaint contains six claims, each of which must be addressed separately.

A.    **Section 1981 Claims**

Taylor's § 1981 claims contain two distinguishable, but related allegations: (i) that he

was the subject of racially discriminatory discipline by CNA, and (ii) that he was constructively

discharged by CNA on the basis of his race.

*1.    Discriminatory Discipline Claim*

Taylor's primary claim against CNA centers on allegations of racially discriminatory

discipline in violation of 42 U.S.C. § 1981. Taylor alleges that the complaints, the resulting

investigation, and the disciplinary measures taken against him reflect racial animus. Central to

these allegations is Taylor's argument that the complaints of Langlitz and Casey lacked

credibility, yet CNA relied on them.

Where, as here, there is no direct evidence of racial animus, plaintiff must satisfy the

*McDonnell Douglas/Burdine* proof scheme.[5]  *See McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also*

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142-43 (2000).  Under that framework, a

plaintiff in a § 1981 case has the initial burden to show a *prima facie* case of discrimination.

*McDonnell Douglas*, 411 U.S. at 802; *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d

248, 268 (4th Cir. 2005).  To show a prima facie case of discriminatory discipline, the plaintiff

must show:

---

[5] Indeed, Taylor concedes that Gunn, the ultimate decision-maker in his case, and Simpson, who
conducted the investigation of Taylor, had no racial animus and were not racially motivated.
Taylor is also unpersuasive in suggesting racial animus based on the fact that, in the nearly
seventy years of CNA's history, it has had only two male, African-American vice presidents,
namely James Collins and the plaintiff himself.  Taylor neglects to point out that CNA currently
has two female African-American vice presidents as well, but in any event, the number of male
African-American vice presidents at CNA over the past seventy years bears little on Taylor's
claim.  Taylor offers no context for this statistic, and it is reasonable to assume that seventy years
of hiring decisions would implicate different decision-makers from the decision-makers who
investigated and disciplined Taylor.

> (1) that he is a member of [a protected class], (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees.

*Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). After the plaintiff has made out a *prima facie* case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the [action]." *McDonnell Douglas*, 411 U.S. at 802. After such a reason has been articulated, the burden shifts back to the plaintiff to show that the employer's nondiscriminatory explanation was a mere pretext.[6] *Reeves*, 530 U.S. at 142-43; *Burdine*, 450 U.S. at 256.

Clearly, Taylor is a member of the appropriate protected class—African Americans—but he has otherwise failed to establish a *prima facie* case of discriminatory discipline. In particular, Taylor has not adduced evidence from which a reasonable jury could find that the disciplinary measures imposed on him were more severe than those imposed on non-African-American employees who engaged in similar behavior. *Cook*, 988 F.2d at 511. Additionally, even assuming, *arguendo*, that Taylor were able to establish such a *prima facie* case, the evidence demonstrates a legitimate, nondiscriminatory reason for CNA's actions, and Taylor has not sufficiently rebutted this showing with evidence that CNA's justification is pretextual. *Reeves*, 530 U.S. at 142-43; *Burdine*, 450 U.S. at 256.

Taylor's *prima facie* case centers on comparing CNA's discipline of him to CNA's discipline of six other individuals. For non-African-American comparators, Taylor has identified

---

[6] In *Reeves*, the Supreme Court explained that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. at 148. In other words, under this proof scheme, a strong showing that the employer's stated basis was false may be sufficient even where plaintiff has not shown that the true basis was discrimination. *Id.* at 148-49.

Asian employee Luther Lau (Comparator 1) and Caucasian employees George Theologis (Comparator 2), Walter Munnikuysen (Comparator 3), Don Cymrot (Comparator 4), and Joseph Steele (Comparator 5). Taylor also compares himself to James Collins (Comparator 6), an African-American, former vice president at CNA who claims to have been terminated by CNA based on discrimination. Since these comparators are critical to Taylor's *prima facie* case, the record facts for each comparator must be examined to determine whether a comparison to Taylor is valid.

Comparator 1 is CNA's CFO, who was accused of sexual harassment by two women. Simpson investigated both complaints. The first employee, who was also Simpson's executive assistant, complained that Comparator 1 was "over-friendly" with her in the office following the termination of their consensual, romantic relationship. By "over-friendly," the employee meant Comparator 1 had been "[f]inding reasons to come into her office to have conversations." Comparator 1 was not "continuing to ask to go on dates," nor was he accused of any inappropriate touching. The employee had not brought her concerns to Comparator 1 directly because "she didn't want to hurt his feelings, but she wanted the over-friendly [sic] to stop." A second employee's complaints were more serious, both because the second employee was Comparator 1's subordinate, and because the complaints included allegations of inappropriate touching. For example, the employee accused Comparator 1 of engaging in shoulder massages, and at one point, sitting so close to the employee that their thighs were touching, even though the seating arrangement made such contact unnecessary. When Simpson questioned Comparator 1 concerning the incidents, he did not deny that they occurred, but he expressed surprise that his actions had been unwelcome. Simpson found numerous inconsistencies in the complainants' stories, and based on what she perceived to be the rehearsed nature of the witness interviews,

Simpson ultimately classified her findings as "inconclusive." Nevertheless, because it was "indisputable" that Comparator 1 had at least "demonstrated poor judgment," he was required, as a condition of continued employment at CNA, to (i) meet with an executive coach, (ii) attend a sexual harassment awareness refresher session, and (iii) attend a respectful workplace refresher session. Comparator 1 complied, and his executive coach ultimately reported that:

> I am pleased to report that [Comparator 1] and I had four very productive . . . sessions. [Comparator 1] was fully engaged and committed to learning as much as he could about the complex issue of sexual harassment . . . . Even more impressive, however, was [his] willingness to look at his own leadership and personality style in order to gain a better understanding of how others see and experience him. He really grasped the concept of Intent vs. Impact, learning to be self-observant . . . [and] then to practice different behaviors to bring about positive results.

At no time was Comparator 1 placed on administrative leave. At some point after these events, Comparator 1 was promoted.

Taylor differs from Comparator 1 in numerous respects. First, unlike Comparator 1, Taylor was accused of both sexual harassment and aggressive behavior, not merely sexual harassment. Second, the complaints regarding Taylor's "bullying" conduct were more numerous than his complaints for sexual harassment, and Taylor's behavior even caused another employee to fear for his own safety. Finally, unlike Taylor, Comparator 1 admitted that the incidents occurred and expressed a clear willingness to understand how he could improve his behavior. In light of these distinctions, Comparator 1 is not a valid comparator for the purpose of this analysis, and CNA was reasonable in imposing more severe discipline on Taylor than on Comparator 1.

As to Comparator 2, the record does not reflect this comparator's actual position at CNA, but it is clear that he held a senior position with the company. Three employees at CNA complained about Comparator 2's "boisterous" and "intimidating" behavior, such as using an

inappropriate tone and invading the personal space of others. Each employee cited a separate incident, and during one of the incidents, Comparator 2 made an employee cry. The initial complaints came in October 2007, and within two days, Gunn reprimanded Comparator 2 in person. Comparator 2 admitted to making the comments and recognized he had engaged in "bad behavior." He was subsequently placed on five days' administrative leave and ordered to meet with an executive coach to discuss anger management and leadership techniques. After additional complaints several months later, Gunn altered Comparator 2's performance evaluation to assign a "1" in the "Demonstrates Leadership" category, indicating "[u]nacceptable performance." Comparator 2 was also denied a pay raise in 2008 based on these complaints. Some time thereafter, HR personnel interviewed several employees working with Comparator 2, who indicated that his behavior and working relationships had improved. Months later, Comparator 2 informed CNA of his intent to leave the company, and he was "not discourage[d]" from doing so. He soon departed the company voluntarily.

Like Comparator 1, Comparator 2 was not accused of the same behavior as Taylor. Both Taylor and Comparator 2 were accused of intimidating behavior, but only Taylor's behavior was significant enough to lead a fellow employee to fear for his own safety. Additionally, Taylor was accused of sexual harassment, while Comparator 2 was not. In any event, Taylor's discipline was in some ways more severe and in some ways less severe than Comparator 2's. On the one hand, only Taylor was placed on administrative leave twice rather than once and ordered to attend four EAP sessions, while on the other hand, Comparator 2, unlike Taylor, was denied a

pay increase and marked down severely in his performance evaluation. In sum, Comparator 2 is

not a valid comparator to Taylor.[7]

The remaining individuals cited by Taylor share even fewer commonalities with Taylor.

As to Comparator 3, CNA's Vice President for Business Development, complaints indicated that

this individual was "demanding" and had "poor interpersonal skills," though "not intimidating."

Notably, complaints came not from Comparator 3's subordinates, as they had with Taylor, but

from his peers at CNA. Even Robert Murray, CNA's CEO, noted that he "didn't enjoy working

with [Comparator 3]" because he was "a very rigid kind of person." Comparator 3 was not

disciplined for the behavior, and he resigned of his own accord in 2006. Upon resignation, he

received a bonus equivalent to 15% of his salary. These facts provide no basis for concluding

that Comparator 3 is a valid comparator. There is no reason to believe that Comparator 3 should

---

[7] Taken in isolation, neither Comparator 1 nor Comparator 2 are helpful to Taylor, but notably, when taken together, these comparators actually indicate consistency in CNA's disciplinary decisions. A brief review illustrates this conclusion. Each of these comparators was only accused of one form of misconduct—sexual harassment or intimidating behavior—while Taylor was accused of both forms of misconduct. That is, the union of the complaints against Comparators 1 and 2 is similar, although not identical, to the totality of the complaints against Taylor. Moreover, the union of the disciplinary measures taken in the comparators' cases is generally consistent with the discipline imposed on Taylor. As to Comparator 1, despite finding his case "inconclusive," Simpson recommended that he meet with an executive coach and attend refresher sessions on sexual harassment and respect in the workplace. Comparator 2 was placed on administrative leave for five days, ordered to meet with an executive coach, denied a pay raise, and assigned the lowest possible score on his leadership evaluation. It follows from these facts that if an employee at CNA were accused of *both* intimidation and sexual harassment, CNA might be expected, at a minimum, to order that the employee (i) be placed on administrative leave for at least five days, (ii) meet with an executive coach, and (iii) attend refresher sessions on sexual harassment in the workplace. Indeed, all of these measures were employed in Taylor's case. Of course, the discipline was slightly different in Taylor's case in that he was required to attend four EAP sessions, but on the other hand, he was not denied a pay raise. In any event, the variations in the underlying facts of each situation explain the relatively slight variation in discipline. And again, an employee expressed concern for his own safety based on Taylor's anger, a serious complaint absent from the cases of Comparator 1 or Comparator 2.

16

have been disciplined simply for having "poor interpersonal skills" or a "rigid" personality. Taylor was accused of far more.

Comparator 4 currently serves as CNA's Vice President for Domestic Research. Prior to his promotion to vice president, one of Comparator 4's subordinates stated Comparator 4 had bullied and intimidated him, and that Comparator 4 had yelled at him in public meetings. The subordinate did not lodge a formal complaint, but defendant Hayes did conduct a brief investigation. When she confronted Comparator 4, he admitted to the truth of the allegations. Hayes recommended that Comparator 4 work with an executive coach and attend an introspective workshop on leadership. Hayes made other recommendations as well, but could not recall the details, and Taylor identifies no other facts in the record to indicate the disciplinary actions taken in Comparator 4's case. In any event, Comparator 4's case differs markedly from Taylor's in that only one person made complaints about Comparator 4, and Comparator 4, when confronted, admitted the allegations and accepted the recommended coaching. On these facts, Comparator 4 is not a valid comparator.

Finally, Taylor points to CNA's treatment of Comparator 5, who served as CNA's Director of Contracts and Procurement. A female, African-American subordinate of Comparator 5 complained that he had spoken down to her in a manner that, to her, suggested racial discrimination. She felt Comparator 5 addressed her in an inappropriate tone and set harsh, unreasonable deadlines for her work. She compared these demands to "chains," adding that it reminded her of "that scene" from "In the Heat of the Night." Simpson investigated the complaints by speaking to others who had been in the room at the time the discussion in issue had occurred, and these witnesses stated that the deadlines had been reasonable and the tone of Comparator 5's comments had been appropriate. Accordingly, no disciplinary action was taken

17

in his case. Taylor, on the other hand, received multiple complaints, and an investigation revealed multiple witnesses who corroborated many of the allegations.

While Taylor has focused his claim of disparate discipline on the five foregoing non-African-American comparators, he attempts to bolster his case by suggesting that CNA also discriminated against an African-American former vice president, James Collins (Comparator 6). Comparator 6, who was deposed in this matter, has accused CNA of terminating him based on his race.[8] He has indicated that CNA officially told him he was terminated for declaring his intention to discuss performance and expectations with his team chiefs, who were also his subordinates, conversations which were seen as unwelcome and unwarranted reviews by a superior. Comparator 6 believes this stated reason for his termination is pretextual. He admits, however, that several employees, including multiple Caucasians *and* African Americans, had lodged complaints against him. Although Comparator 6 was terminated without first being placed on a performance improvement plan, he admits that Simpson informally discussed with him the ways in which he could improve his performance. Ultimately, Comparator 6 believes that racial bias played a role in his termination.

The differences between Comparator 6 and Taylor are manifest. Comparator 6 never received complaints of intimidating behavior or sexual harassment, as Taylor had. Additionally, the two men reported to different supervisors, and ultimately the decisions in each of their cases were made by different individuals at CNA. These two facts—different complaints and different decision-makers—render Comparator 6 inappropriate for comparison to Taylor. Notably, Comparator 6 also stated that he was treated fairly by Gunn and Simpson, the two key figures in the decision-making process in Taylor's case. Finally, the complaints against Taylor came from

---

[8] Indeed, Comparator 6 claims he has sued CNA in a separate, pending matter, alleging racial discrimination.

both Caucasian and African-American employees. In all, the many differences between Taylor and Comparator 6 far outweigh any similarities, and he is thus not a valid comparator for the purposes of this analysis.

Any case of employee discipline will involve unique circumstances that require an individualized examination by the employer. In reviewing an employee's conduct, an employer must carefully consider a wide range of factors, including the credibility of the complainants, the employee's commitment to improvement, the employee's disciplinary history, the impact of the proposed discipline on the employee's future, and the company's historical approach to similar disciplinary problems. Such a complex decision will inevitably result in variations from case to case, but these variations are often nothing more than the appropriate consequence of reasonable and nuanced deliberation by the employer. Where not-insignificant variations in discipline show a correlation with the variations in the races of the employees to be disciplined, an inference of discrimination may be appropriate. But that is not the case here. In sum, a reasonable jury examining the comparators cited by Taylor could not conclude that he has established a *prima facie* case of discriminatory discipline against CNA.

Even assuming, *arguendo*, a *prima facie* case of discrimination, CNA has articulated a "legitimate, nondiscriminatory reason" for the discipline imposed on Taylor. *McDonnell Douglas*, 411 U.S. at 802. The disciplinary action imposed on Taylor was a reasonable response to the specific complaints made against him and the facts disclosed in the investigation of those complaints. Taylor's assertion that CNA should not have believed the complaints from Langlitz and Casey because the two were at risk of termination is not supported by the record, and even if that were a closer question, several other individuals at CNA also complained of Taylor's conduct. In reviewing the complaints, it is not necessary to decide whether the incidents did or

19

did not occur as described by the complainants; the fact finder need only determine that CNA had "a legitimate, nondiscriminatory reason" for its response to such complaints. *Id.* On this record, no reasonable jury could find, that CNA lacked a reasonable basis for its actions.

Accordingly, even assuming Taylor has established a prima facie case of discrimination, which he has not, CNA would certainly satisfy its responsive burden under *McDonnell Douglas*, and the burden would shift back to Taylor to demonstrate that this explanation is false or pretextual. *McDonnell Douglas*, 411 U.S. at 804; *Reeves*, 530 U.S. at 142. Taylor has not produced any evidence tending to show that CNA's stated basis for disciplining Taylor was false, nor has Taylor shown evidence of intentional discrimination. Indeed, Taylor's own admissions belie his claim that the decision-makers in this case acted with racial animus. Ultimately, all of the decisions concerning Taylor's discipline fell to Gunn. Not only has Taylor conceded that Gunn acted without racial bias, but Taylor has repeatedly noted that Gunn had treated him fairly from the moment Taylor was hired. Additionally, Taylor admits that Gunn personally recruited Taylor to work at CNA. It is unlikely that a supervisor would hire an individual, knowing full well the person's race, only to force the employee out at a later date based on racial animus. *Cf. Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.").

Additionally, Simpson, who played a major role in investigating the complaints against Taylor and recommending remedial action, is African-American. Simpson's race is relevant in this case because an allegation of discrimination loses persuasiveness when a key player in the disciplinary process falls within the same protected class as the plaintiff. *See Coggins v. Gov't of*

*D.C.*, No. 97cv2263, 1999 U.S. App. LEXIS 2603, at *11 (4th Cir. Feb. 19, 1999) (unpublished) ("The fact that both Krull and Gibbons, first and third in Coggins' chain-of-command, are both Caucasian makes any anti-Caucasian bias unlikely."); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("[I]t is difficult for a plaintiff to establish discrimination when the allegedly discriminatory decision-makers are within the same protected class as the plaintiff.").

In spite of these facts, Taylor argues that racial animus is clear from two instances where persons directly referenced race when speaking about Taylor. First, Taylor points to a statement that Casey made to another coworker that she believed "Mr. Taylor has a problem with middle aged white women." As an initial matter, this statement on its face merely accuses *Taylor* of racial bias, rather than revealing racial bias in Casey. In any event, this "mere scintilla" of evidence, *Celotex*, 477 U.S. at 324, does not give rise to a triable issue of fact concerning any racial animus of Casey. Notably, Casey was not a decision-maker in Taylor's investigation or discipline, meaning that her own bias is not legally relevant to the ultimate question of whether CNA imposed discriminatory discipline. *See Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 287 (4th Cir. 2004) ("The discrimination statutes, however, do not make employers vicariously liable for the discriminatory acts and motivations of everyone in their employ, even when such acts or motivations lead to or influence a tangible employment action."). Second, Taylor notes that Simpson told Dr. Teel, with whom Taylor would have met for counseling consistent with the November 16 Memorandum had he not resigned, that "race was important" to Taylor and that "white women are his scorn." As with Casey's statements, the statements made by Simpson accuse Taylor of racial animus rather than revealing any animus on the part of Simpson. In any event, Dr. Teel recalled that when Simpson made these comments, Simpson was explaining that Taylor tried to "identity with her as an African American, but she didn't

really share those same sentiments." As such, Taylor's argument that Simpson acted with racial animus in making the statements is meritless.

As this analysis demonstrates, a reasonable jury could not conclude, based on the record viewed in a light most favorable to Taylor, that CNA is liable for discriminatory discipline pursuant to 42 U.S.C. § 1981.

### 2. Constructive Discharge on the Basis of Race

As part of his § 1981 claim, Taylor also claims he was constructively discharged from CNA on the basis of his race. Again, because there is no record evidence of direct discrimination, to establish his claim Taylor must rely on the *McDonnell Douglas/Burdine* proof scheme. First, Taylor must make out a *prima facie* case by showing (i) that he is a member of a protected class; (ii) that he was qualified for the job and performed the job satisfactorily; (iii) that in spite of his qualifications and performance, he was constructively discharged; and (iv) that the position remained open to similarly qualified applicants after Taylor's dismissal or was filled by a person outside the protected class. *Alba v. Merrill Lynch & Co.*, 198 Fed. Appx. 288, 294 (4th Cir. 2006); *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994); *see also Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) ("Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes.")

As for the third prong of this framework—establishing a constructive discharge— plaintiff must show two elements. First, the plaintiff must show that the conditions were "intolerable." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). This intolerability must be evaluated objectively, not on the basis of an employee's unusual sensitivities. *Id.* For example, a demotion, which ordinarily is not sufficient to amount to a constructive discharge, could amount to a constructive discharge where "the demotion is

essentially a career-ending action or a harbinger of dismissal." *Carter*, 33 F.3d at 459. Second, the employers' actions must be "deliberate"; that is, the employer's actions must have been "intended by the employer as an effort to force the plaintiff to quit." *Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 272 (4th Cir. 2001) (citing *Taylor v. Va. Union Univ.*, 193 F.3d 219, 237 (4th Cir. 1999) (en banc), *cert. denied*, 528 U.S. 1189 (2000)). Such intent "may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions." *Bristow*, 770 F.2d at 1255.

These principles, applied here, compel the conclusion that Taylor had failed to establish a *prima facie* case of constructive discharge. The undisputed facts show neither objectively intolerable conditions, nor any deliberate intent by CNA, particularly Gunn, to induce Taylor to quit. In this case, the facts Taylor relies upon to show that the environment at CNA was "intolerable" are virtually indistinguishable from the facts relevant to his discriminatory discipline claim. For example, he notes that when he was placed on administrative leave following complaints that he had bullied and intimidated two employees, the leave was indefinite, and CNA was vague in explaining the situation to Taylor's coworkers, leaving them to wonder whether Taylor had done something inappropriate. He further claims that African-American employees at CNA are treated as "guilty until proven innocent" when accused of infractions.

Of course, if CNA's investigatory and disciplinary actions with respect to Taylor are not attributable to racial bias, then this claim for constructive discharge under § 1981 fails as matter of law. As the prior discussion of Taylor's discriminatory discipline claim makes clear, no reasonable jury could find discriminatory discipline on the basis of this record. Accordingly,

these acts cannot support a finding that discrimination made Taylor's employment "intolerable" for the purposes of a constructive discharge claim.[9]

More fundamentally, Taylor's claim fails because he has not cited sufficient evidence to support his belief that he would have been terminated had he completed the course of discipline imposed by CNA. In essence, Taylor claims he was constructively discharged because the requirement that he meet with a mental health counselor would have resulted in the loss of his security clearance, which, in turn, would compel his termination from CNA. Taylor's clearance was indeed a requirement of continued employment, but Taylor cites no evidence to indicate that meeting with a mental health counselor would jeopardize his clearance.[10] While a mental health evaluation may well be relevant to a government security clearance, it does not follow that a meeting with a counselor would, by itself, lead to revocation. Indeed, Taylor had already met with Dr. Crowley for a fitness-for-duty evaluation, at which time Dr. Crowley recommended

---

[9] In setting forth facts relevant to constructive discharge, Taylor attempts to argue that working conditions at CNA were intolerable in part because other employees who engaged in similar conduct were not disciplined in a similar manner. While the premise of his argument—that CNA engaged in discriminatory discipline—lacks a sufficient basis in fact, it is worth noting that Taylor's argument is also wrong as a matter of law. In a constructive discharge claim, the only conditions that are relevant to intolerability are those deliberately generated to induce the employee to resign. *Matvia*, 259 F.3d at 272. As such, it is the negative treatment itself, and not the fact that the treatment is disparate, that would be relevant to an allegation of intolerable conditions. One exception might be a situation where the perpetrators of the negative treatment intended for the employee to recognize the treatment as disparate, thereby making the employee feel "singled out" and unwelcome. Such brazen conduct might support a showing of intolerable conditions, but this would be the rare case and the record here supports no such inference.

[10] Accordingly, for the purpose of this summary judgment motion, Taylor's bare assertion in this regard is unpersuasive. *See* Rule 56(e)(2), Fed. R. Civ. P. ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial."); Local Civil Rule 56(B) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

Taylor see another counselor as a condition of continued employment. No reasonable jury could conclude, therefore, that these disciplinary measures left Taylor no alternative but to leave CNA.

Accordingly, because there is no genuine issue of fact as to Count I of Taylor's complaint, and because the record viewed in a light most favorable to Taylor demonstrates no violations of § 1981, defendants must be granted summary judgment on this count.[11]

## B. Defamation

In Count II of his complaint, Taylor alleges that defendants made defamatory statements about him, such as the accusations that Taylor engaged in "sophistry," "challeng[ed] subordinates as to [his] effectiveness as a manager," and "encourag[ed] subordinates to talk about their personal lives." He accuses defendants of fabricating the statements or reciting them while knowing them to be false with the intent to defame him. Most forcefully, Taylor claims defamation in the statement in the original draft of the November 16 Memorandum from Gunn referencing multiple complaints of sexual harassment, when in fact there had only been one formal complaint on this ground.

Under Virginia law, a plaintiff claiming defamation must show (i) publication (ii) of an actionable statement with (iii) the requisite intent. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). To be "actionable," the statement must not only be false, but defamatory, that is, it must "tend so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* In other words,

---

[11] Taylor also asserts a claim for hostile work environment within Count I of his Complaint, but he cites no evidence in support of this claim apart from that which he already cites in support of his discriminatory discipline claim. In any event, for the reasons already stated in analyzing his other § 1981 claims, Taylor has not established a genuine dispute of material fact over whether "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [Taylor's] employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citations and quotations omitted).

"merely offensive or unpleasant statements" are not defamatory; rather, defamatory statements "are those that make the plaintiff appear odious, infamous, or ridiculous." *Id.* (citation omitted). Furthermore, "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." *Yeagle v. Collegiate Times*, 255 Va. 293, 295, 497 S.E.2d 136 (1998). Such speech is sometimes referred to as "pure expressions of opinion." *Id.* at 295 n.1. As to intent, the requisite standard varies based on the status of the plaintiff as a public or private figure. Where, as here, the plaintiff is a private individual, the defendant may be found liable if the defendant knew the statement to be false or negligently failed to ascertain whether the statement was false. *Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, 725 (1985).

A statement is defamatory *per se* if it (i) imputes the commission of a crime of moral turpitude for which a party may be convicted, (ii) imputes that the person is infected with a contagious disease which would exclude the person from society, (iii) imputes an unfitness to perform the duties of a job or lack of integrity in the performance of duties, or (iv) prejudices the party in her profession or trade. *Yeagle*, 255 Va. at 297 n.2 (citing *Fleming v. Moore*, 221 Va. 884, 889, 275 S.E.2d 632 (1981)). Whether a statement is actionable as defamatory and whether it is defamatory *per se* are matters of law for the trial judge to determine. *Id.* at 296; *Chapin*, 993 F.2d at 1092.

The publication requirement for defamation requires a dissemination of the statement to a third party where that dissemination does not occur in a privileged context. *See Montgomery Ward & Co. v. Nance*, 165 Va. 363, 379, 182 S.E. 264 (1935). In this regard, it is well-settled under Virginia law that "communications between persons on a subject in which the persons have an interest or duty are occasions of privilege," and that "statements made between co-

employees and employers in the course of employee disciplinary or discharge matters are privileged." *Larimore v. Blaylock*, 259 Va. 568, 572, 528 S.E.2d 119 (2000); *see also Southeastern Tidewater Opportunity Project, Inc. v. Bade*, 246 Va. 273, 275, 435 S.E.2d 131 (1993) (holding that a letter was privileged because it "was written in the context of his employment relationship"). Thus, the privilege applies broadly to all statements related to "employment matters," provided the parties to the communication have a duty or interest in the subject matter. *Larimore*, 259 Va. at 574-75. And, employees have a general duty "to inform management of adverse or improper actions by fellow employees," just as management has a duty "to investigate and make decisions regarding matters of continued employment." *Id.* at 575. It is also settled that this privilege is qualified and is lost "if a plaintiff proves by clear and convincing evidence that the defamatory words were spoken with common-law malice." *Southeastern Tidewater*, 246 Va. at 276; *see also Larimore*, 259 Va. at 572. Common-law malice, in turn, is "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." *Southeastern Tidewater*, 246 Va. at 276. In other words, to avoid the qualified privilege plaintiff must show that "the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff." *Id.*

As these principles make clear, the statements by individuals at CNA cited by Taylor are not actionable for defamation. To begin with, most of the statements are matters of opinion, such as those statements from Langlitz and Casey calling Taylor "intimidating" and "bullying." As to the underlying facts asserted in the complaints against Taylor, the statements concern firsthand accounts by the complainants, and Taylor cites no evidence in the record that could lead a reasonable jury to conclude that any of the complainants acted with malice in reporting

their stories.[12] The remaining statements concern the investigation and disciplinary action at CNA, which are subject to qualified privilege. For example, Taylor alleges that the November 16 Memorandum was defamatory, but the statements in that memorandum were clearly "made between co-employees and employers in the course of employee disciplinary or discharge matters."

In opposing summary judgment, Taylor does not contest the application of the qualified privilege, instead arguing that the privilege was lost because the statements were made maliciously. Importantly, however, such a claim must be proven by clear and convincing evidence, *Southeastern Tidewater*, 246 Va. at 276, and the record provides no basis for a reasonable jury to make such a conclusion by this elevated standard. Furthermore, Taylor's emphasis on the reference to "two" sexual harassment complaints in the November 16 Memorandum is misplaced. The facts do not support an inference that defendants had the requisite intent to defame Taylor when incorrectly writing "two" in the first draft of this memorandum. While technically speaking, Langlitz was the only employee to charge Taylor formally with sexual harassment, Patel reported that Taylor had made comments implying that she was a prostitute. Patel's report did not constitute a formal complaint for sexual harassment, but it explains why the November 16 Memorandum would reference two such complaints. Moreover, Taylor was presented with a copy of the memorandum, and when he objected to the

---

[12] It is worth noting here that a showing of malice to overcome qualified privilege requires more than simply that the statement is critical of the plaintiff. Were it otherwise, qualified privilege would essentially always raise a jury question, and the exception would swallow the rule. *Cf. Southeastern Tidewater*, 246 Va. at 276 (malice requires evidence that the "behavior [be] actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made."). More importantly, however, Taylor disputes very little of these accounts except whether his conduct was offensive. Of course, whether his conduct was indeed harassing, bullying, or otherwise inappropriate is irrelevant to the defamation claim since these are matters of opinion. *See Yeagle*, 255 Va. at 295 (statements of opinions are not actionable as defamation).

word "two," it was stricken from the draft.[13] Such facts further dispel the argument that

defendants acted knowingly or negligently with regard to the truth.[14] Accordingly, defendants

must be granted summary judgment on Count II.

## C.    Breach of Contract

Count III alleges that CNA breached its contract with Taylor by failing to pay him a

bonus for calendar year 2009. Taylor's claim fails for the fundamental reason that he has

established no contractual obligation for CNA to provide him a bonus on any criteria that can be

judicially reviewed. When a bonus is tied to vague, discretionary criteria, there can be no

enforceable contractual obligation to provide such a bonus because a fact finder would have no

standard to apply. *See Degirolamo v. Sanus Corp. Health Sys.*, 1991 U.S. App. LEXIS 12281

(4th Cir. June 17, 1991) (affirming summary judgment to an employer where the employment

contract gave the employer discretion in setting criteria for the bonus).

Taylor adduces no evidence to show that CNA made an enforceable promise to Taylor

regarding his annual bonuses. *See* Rule 56(e)(2), Fed. R. Civ. P. (requiring opponents to

summary judgment to provide factual support for any assertions); Local Civil Rule 56(B) (same).

Taylor may have been awarded bonuses in the past, but these bonuses apparently included an

element of discretion, as is typical of incentive-based compensation. For example, Gunn noted

in his affidavit that Taylor's 2008 bonus was significantly less than his 2007 bonus because of

"less than stellar earnings of his division and other performance factors." While no official

calculation was made for Taylor's 2009 bonus because he left the company before bonuses

---

[13] Additionally, since the individuals who were privies to the first draft of the memorandum were also privies to the correction, any injury from the false statement would be trivial at best.

[14] This result is consistent with the earlier analysis of Taylor's discriminatory discipline claim, where it was held that the undisputed facts (i) demonstrate an articulable, legitimate, nondiscriminatory basis for CNA's actions and (ii) do not support a showing of pretext.

would ordinarily be calculated, Gunn testified that Taylor's 2009 bonus would have been close to zero based on the poor overall performance of Taylor's division and the "challenging aspects of [Taylor's] professional behavior."[15] Past discretionary bonuses do not furnish a basis for claiming bonuses as a matter of right. Given the discretionary nature of the bonuses, Taylor has not demonstrated an enforceable obligation on the part of CNA, and therefore Count III fails as a matter of law.

## D. Tortious Interference with Business Expectancy

In Count IV, Taylor alleges tortious interference with his employment relationship at CNA by the individual defendants, namely, Langlitz, Casey, and Hayes. Taylor claims that these defendants "conspir[ed] to injure [his] reputation, portray[ed] [him] in a false and defamatory light, claim[ed] that [he] had sexually harassed and acted in a threatening and/or intimidating manner . . . , and engag[ed] in deception and dishonesty in their dealings" both with Taylor and with others at CNA about Taylor. Compl. ¶ 192. He further alleges that absent this interference, he would have realized "continued and significant future economic benefit with CNA including a realization of salary and bonuses, health and life insurance, pension and savings plans, and retirement benefits." *Id.* ¶ 188.

Under Virginia law, to establish tortious interference with a prospective business relationship, a plaintiff must show

> (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional

---

[15] Taylor suggests that he should have received a bonus because another employee, Walter Munnikuysen, received a substantial bonus as part of his severance package. This argument is unpersuasive. As discussed previously, the facts concerning Munnikuysen demonstrate that he does not serve as an appropriate comparator to Taylor. *See supra* Part III.A.1 (discussing "Comparator 3"). In any event, the fact that another employee received a bonus after leaving CNA is irrelevant to whether CNA had an enforceable obligation to provide a bonus to Taylor.

misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff.

*Commercial Bus. Sys., Inc. v. Halifax Corp.*, 253 Va. 292, 484 S.E.2d 892, 896 (1997) (quoting *Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69, 77 (1984)). The first and third elements of this tort require objective proof, not the mere hope or possibility of future benefit. *Id.* at 897.

The most glaring problem with Taylor's tortious interference claim is that he alone made the decision to resign from CNA. It is axiomatic that a plaintiff cannot sustain a claim of tortious interference with business expectancy when he willingly surrendered his right to those expectancies. Of course, if conditions at CNA had become so intolerable that Taylor were effectively left no practical choice other than quitting, then it would be unfair to characterize his decision as willingly made. But Taylor alleged precisely this scenario in Count I when he asserted that he was constructively discharged from CNA, and for the reasons stated *supra*, Taylor's claim for constructive discharge fails. Accordingly, Taylor's claim for tortious interference must be denied.

## E.   Common Law Conspiracy

In Count V, Taylor alleges that Langlitz and Casey engaged in an unlawful civil conspiracy to injure Taylor. In Virginia, the elements of a common law civil conspiracy claim are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff. *Glass v. Glass*, 228 Va. 39, 47, 321 S.E.2d 69 (1984). "[I]n Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." *Almy v. Grisham*, 273 Va. 68, 80 (2007). This is so because "[t]he gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means."

*Gallop v. Sharp*, 179 Va. 335, 338, 19 S.E.2d 84, 86 (1942). Thus, where "there is no actionable claim for the underlying alleged wrong, there can be no action for civil conspiracy based on that wrong." *Citizens for Fauquier County v. SPR Corp.*, 37 Va. Cir. 44, 50 (1995); *see also Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007).

Because none of the substantive torts alleged by Taylor survive summary judgment, this count, too, must fail. Furthermore, the record here is insufficient to allow a reasonable jury to conclude that Casey and Langlitz had an "agreement" to injure Taylor. Other than the mere fact that the two defendants spoke often, Taylor's only proof of a coordinated scheme comes from an email from Langlitz to Casey discussing a "plan" for Taylor when he returns to work after administrative leave. The message, however, came at the end of an email exchange that originally included Hausmann, Gunn, Hayes, and Simpson, and which had referred to strategies for avoiding any awkwardness or hostility upon Taylor's return. There is no basis to conclude that the "plan" referred to something other than these positive and productive measures. Accordingly, defendants are entitled to summary judgment on Taylor's conspiracy claim.

## F.    Intentional Infliction of Emotional Distress

In Taylor's final count, he alleges that because of defendants' conduct, Taylor suffered insomnia, paranoia, anxiety, depression, and a severe ulcer requiring exploratory surgery, thus giving rise to a claim for intentional infliction of emotional distress.

To recover on such a claim in Virginia, a plaintiff must show, by clear and convincing evidence, that "1) the wrongdoer's conduct was intentional or reckless; 2) the conduct was outrageous or intolerable; 3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and 4) the resulting emotional distress was severe." *Supervalu, Inc. v. Johnson*, 276 Va. 356, 370, 666 S.E.2d 335 (2008); *see also Almy v. Grisham*, 273 Va. 68, 77, 639 S.E.2d 182 (2007); *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145 (1974). Each

32

of these elements must be proven by clear and convincing evidence because the tort is "not favored" due to the "inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury." *Supervalu*, 276 Va. at 370. With respect to the first element, a plaintiff must show that "the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result." *Womack*, 215 Va. at 342. To establish the second element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White*, 241 Va. 23, 27, 400 S.E.2d 160 (1991) (quotations omitted). As to the final element, "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Id.* (quotations omitted).

Taylor's claim fails because he cannot show "outrageous conduct" by defendants. As discussed *supra*, the record cannot support his claims for discriminatory discipline, defamation, and tortious interference, and it is this conduct on which the claim for intentional infliction of emotional distress relies. Thus, Taylor's claim of intentional infliction of emotional distress falls short of his burden to show, by clear and convincing evidence, "outrageous" character on the part of the defendants so as to survive summary judgment on this count. *Russo*, 241 Va. at 26.

## IV.

In sum, plaintiff has not demonstrated a genuine issue of material fact that supports the need for a trial. As to his § 1981 claim (Count I), plaintiff has not adduced sufficient evidence to allow a reasonable jury to find discriminatory treatment or constructive discharge. Additionally, defendants have established a legitimate, nondiscriminatory basis for their actions, and plaintiff has not provided sufficient evidence of pretext to overcome this showing. Plaintiff's defamation

claim (Count II) fails because the statements are either (i) subject to a qualified privilege, (ii) statements of opinion, or (iii) were not made with the requisite intent to defame. Plaintiff's contract claim (Count III) fails because he has demonstrated no enforceable obligation by his employer to pay him a bonus on any standard that a fact finder could apply. The claim for tortious interference with business expectancy (Count IV) fails because plaintiff left the company on his own accord, not pursuant to a forced or constructive discharge, and he cannot recover from others for expectancies he voluntarily abandoned. Plaintiff cannot succeed on his common law conspiracy claim (Count V) because Taylor has not shown either an underlying tort or an underlying agreement. Finally, the claim for intentional infliction of emotional distress (Count VI) fails because Taylor has failed to show "outrageous" conduct by defendants. Accordingly, defendant is entitled to summary judgment on all counts.

An appropriate Order will issue.

Alexandria, Virginia
August 27, 2010

T. S. Ellis, III
United States District Judge